# United States Court of Appeals
## For the First Circuit

No. 09-2566

SAN GERÓNIMO CARIBE PROJECT, INC.,

Plaintiff, Appellant,

v.

HON. ANÍBAL ACEVEDO-VILÁ, in his individual and personal capacity; HON. ROBERTO SÁNCHEZ-RAMOS, in his individual and personal capacity; LUIS A. VÉLEZ-ROCHE, P.E., in his individual and personal capacity; JOHN DOE; JANE DOE,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin, Lipez, Howard and Thompson, Circuit Judges.

Richard H. Fallon, Jr., with whom John M. García, García & Fernandez, and Orlando Fernández were on brief, for appellant.
Susana I. Peñagarícano-Brown, Assistant Solicitor General, Department of Justice, with whom Luis R. Román-Negrón, Solicitor General, was on brief, for appellees.
Sookyoung Shin, Assistant Attorney General, with whom Martha Coakley, Attorney General of Massachusetts, William J. Schneider, Attorney General of Maine, and Michael A. Delaney, Attorney General of New Hampshire, were on brief, for the Commonwealth of Massachusetts and the States of Maine and New Hampshire, amici curiae.

July 24, 2012

En Banc

**LYNCH, Chief Judge**.   This en banc opinion addresses whether the mistaken invocation by state officials of emergency powers granted by state law to stay a major construction project gives rise to a federal claim of denial of procedural due process under the Parratt-Hudson doctrine, as developed in Parratt v. Taylor, 451 U.S. 527 (1981), Hudson v. Palmer, 468 U.S. 517 (1984), and Zinermon v. Burch, 494 U.S. 113 (1990).   We hold that the Parratt-Hudson doctrine applies, so no federal procedural due process claim is stated.

The San Gerónimo Caribe Project, Inc. (SGCP) appeals from the dismissal of its federal procedural due process claims.   On December 27, 2007, the Regulations and Permits Administration (ARPE), a Puerto Rico agency, acting under a statute authorizing summary process in emergency situations presenting an imminent danger to the public health, safety, and welfare, issued a temporary emergency stay of SGCP's ongoing multi-million dollar construction project.  A state intermediate appellate court upheld the exercise of emergency powers.   The stay lasted sixty-three days, until the Puerto Rico Supreme Court vacated it.   That court issued an opinion on July 31, 2008, disagreeing that there had been any imminent danger warranting invocation of the emergency procedure statute and concluding that the stay was issued in error and in violation of Puerto Rico law.

On October 24, 2008, SGCP filed a federal suit against the Governor of Puerto Rico, the Secretary of Justice, and individual members of ARPE asserting, among other claims, that ARPE violated the Due Process Clause of the Fourteenth Amendment by failing to hold a predeprivation hearing before temporarily suspending the construction permits. SGCP sought $38 million in compensatory damages, as well as other relief. The district court rejected SGCP's claims at the motion to dismiss stage, holding that no predeprivation process was required under the Parratt-Hudson doctrine. San Gerónimo Caribe Project, Inc. v. Vila, 663 F. Supp. 2d 54, 65 (D.P.R. 2009).

A panel of this court held that there was a due process violation but still affirmed the judgment of the district court, on only qualified immunity grounds. San Gerónimo Caribe Project, Inc. v. Acevedo-Vilá, 650 F.3d 826 (1st Cir. 2011). The panel held that under Zinermon, 494 U.S. 113, ARPE was required to provide predeprivation process before suspending SGCP's permits and the Parratt-Hudson doctrine was inapplicable. San Gerónimo, 650 F.3d at 836-38. However, the panel also found that some of this court's past precedent on the matter could have reasonably supported ARPE's determination and affirmed dismissal on the grounds that the defendants were entitled to qualified immunity. Id. at 838-39.

-4-

A majority of active judges of this court voted to grant rehearing en banc and issued an order vacating the panel opinion.[1] San Geronimo Caribe Project, Inc. v. Acevedo Vila, 665 F.3d 350 (1st Cir. 2011).

We conclude that the mistake made by ARPE (as found by the Puerto Rico Supreme Court) fits within the "random and unauthorized" prong of the Parratt-Hudson doctrine, and that Zinermon does not apply. As a result, plaintiff's federal procedural due process claim was properly dismissed. The defendant state officials were also entitled to qualified immunity, also warranting dismissal.

I.

We assume as true the plaintiff's "well-pleaded factual allegations" contained in the complaint. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009). We draw all reasonable inferences in favor

---

[1] In the order granting rehearing en banc, this court requested that the parties address three questions:

1. How do the principles of the Parratt-Hudson doctrine, including its development in Zinermon v. Burch, 494 U.S. 113 (1990), apply in the circumstances of this case?

2. Is First Circuit law inconsistent with this governing Supreme Court law? If so, is that circuit precedent relevant to the 'clearly established law' analysis for purposes of the qualified immunity inquiry?

3. Assuming a due process violation occurred in the present case, does qualified immunity apply?

San Geronimo Caribe Project, Inc. v. Acevedo Vila, 665 F.3d 350, 351 (1st Cir. 2011).

of the plaintiff.  Hill v. Gozani, 638 F.3d 40, 55 (1st Cir. 2011).  However, we "are not bound to accept as true a legal conclusion couched as a factual allegation," Iqbal, 129 S. Ct. at 1950 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)) (internal quotation marks omitted), nor do we consider "naked assertion[s] devoid of further factual enhancement," id. at 1949 (alteration in original) (quoting Twombly, 550 U.S. at 557) (internal quotation marks omitted).  See also Soto-Torres v. Fraticelli, 654 F.3d 153, 156 (1st Cir. 2011).  We also consider the various state decisions of public record giving rise to this claim.[2]  The facts are not in dispute; the legal conclusions from the facts are.

---

[2]  See Parker v. Hurley, 514 F.3d 87, 90 n.1 (1st Cir. 2008) (allowing consideration of "documents the authenticity of which are not disputed by the parties; for official records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint" (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)) (internal quotation mark omitted)); see also Giragosian v. Ryan, 547 F.3d 59, 66 (1st Cir. 2008) ("A court may consider matters of public record in resolving a Rule 12(b)(6) motion to dismiss.  Matters of public record ordinarily include 'documents from prior state court adjudications.'" (citation omitted) (quoting Boateng v. InterAmerican Univ., Inc., 210 F.3d 56, 60 (1st Cir. 2000))).

A.        Factual Background

In January 2000, the Planning Board of Puerto Rico[3] approved the development of a mixed residential, commercial, and tourism project, known as the Paseo Caribe Project, to be developed under the auspices of SGCP, a privately held corporation.

Upon approval of the project, SGCP acquired several parcels of land for the project from Hilton International of Puerto Rico, Inc.  Hilton, in turn, had acquired these parcels from the Hotel Development Corporation, a subsidiary of the Tourism Company of Puerto Rico, in 1998.  These parcels of land are located near the Fortín San Gerónimo del Boquerón, the San Gerónimo Fortress, a historic structure built in the late 16th century, which is listed on the National Register of Historic Places.

As to the legality of the sale of some of the lands to SGCP, in 2002 the Puerto Rico Department of Justice (PRDOJ) issued an opinion concluding that, while some of the lands within the boundaries of the Paseo Caribe Project had emerged from the sea, they were nevertheless not part of the public domain and could be sold, as they were, without legislative action.  This opinion was consistent with a previous opinion of the Justice Department from 1970.

_____

    [3]  The Planning Board is "attached to the Governor's Office." P.R. Laws Ann. tit. 23, § 62a.  It is charged with "guiding the integral development of Puerto Rico," id. § 62c, and possesses a variety of powers relating to development, including the power to adopt zoning regulations, id. §§ 62j, 62o.

Beginning in December 2000, ARPE[4] issued all of the permits necessary for SGCP's development of the project. Construction, to be conducted in several stages, began in August 2002. Starting in 2002, SGCP and the Puerto Rico Institute of Culture entered into unsuccessful negotiations over public access to the Fortín San Gerónimo, which had been adversely affected by the construction. Public controversy had developed over this access issue, and by 2006 active public protests, requiring police intercession, had begun to occur at the site. The Puerto Rico Senate in June 2006 authorized a Senate Commission to conduct an investigation.[5] In February 2007, the PRDOJ began its own investigation and developed concerns not only about public access

---

[4] At all times relevant to this litigation, ARPE had the following characteristics. It was "attached to the Puerto Rico Planning Board." P.R. Laws Ann. tit. 23, § 71a (2008). A primary purpose of ARPE was to "exercise the functions, duties and responsibilities which the Planning Board may delegate to the Administration." Id. § 71d(q). The Puerto Rico Supreme Court has described ARPE as the "operational arm" of the Planning Board. Administración de Reglamentos y Permisos v. Rivera Morales, 159 P.R. Dec. 429, 438 (2003) (quoted in San Gerónimo Caribe Project, Inc. v. Administración de Reglamentos y Permisos, KLRA200800010, 2008 WL 1744564 (P.R. Cir. Feb. 6, 2008) (certified translation provided by the parties)).

In 2009, Puerto Rico passed the Permit Process Reform Act, which effected substantial changes to ARPE and the permit process. See P.R. Laws Ann. tit. 23, §§ 9011 et seq. These changes do not concern us here.

[5] Counsel for the defendants informed us that the Senate was at that time under the control of a political party different from that which controlled the executive branch.

to the Fortín, but also about the ownership of some of the land on which SGCP's construction had been taking place.

During that investigation, on December 11, 2007, the PRDOJ Secretary issued an advisory opinion which concluded that SGCP was not the rightful owner of certain portions of the land on which the project had been built, because that land was gained from the sea and no appropriate legislation transferring ownership to a private party had ever been passed. The opinion found that the two previous PRDOJ opinions were erroneous and should be disregarded.

The opinion "recommend[ed] that the concerned executive governmental entities reevaluate all the administrative decisions already taken" in light of the new opinion, which was "the official interpretation of the Executive Branch of the Commonwealth of Puerto Rico." The opinion noted that it was only "advisory" and did not constitute a final determination of the ownership of the land in question, as only the courts had the authority to pronounce such a judgment. The opinion characterized itself as "in the public interest," given "that controversies related with the Paseo Caribe Project have captured the attention of our people," resulting in "public outcry." The opinion also made clear that it did not pass judgment on "whether a permit . . . was either correct or wrong."

The opinion "recommend[ed]" that other agencies "perform an exhaustive reevaluation of all the permits . . . and other

determinations" regarding the project, and made clear that it did not "dictate the precise method through which the different governmental entities concerned should proceed with their reevaluation and with any possible stay of the construction still ongoing." It stressed that the agencies should act pursuant to applicable laws and "safeguard[] any procedural and substantive law or rights the affected parties may have," including ensuring that all proceedings comported with "due process of law." It noted that ARPE "has ample power to set aside permits," quoting the relevant regulations. This included the power to revoke permits that were "granted by fraud or error." No specific mention was made of the "[e]mergency adjudicatory procedure" of P.R. Laws Ann. tit. 3, § 2167.[6]

The next day, December 12, 2007, the Governor publicly ordered all administrative agencies to suspend all permits for the project and freeze all construction for an initial period of sixty days. This appears to have been an unusual step.

On December 14, 2007, the Planning Board issued a resolution which, among other things, (1) requested SGCP's comments

_____

[6] The opinion also noted that the legislature might ultimately need to determine what should be done about the Paseo Caribe project, explaining that, at one extreme, total demolition of the part of the project built on public land might take place, that at the other extreme, total legalization of the project might occur, or that there might be some compromise involving the modification of the project or compensation paid by SGCP for the public lands.

on the Secretary of Justice's opinion and (2) ordered ARPE to take measures it deemed necessary to implement the recommendations of the opinion, "including, but not limited, to hold[ing] an administrative hearing where the parties' right to due process be guaranteed."

That same day the ARPE administrator issued an order to show cause, requesting that SGCP demonstrate why the permits issued by ARPE should not be suspended and construction halted for sixty days, based on the Secretary's opinion, and it scheduled a hearing for six days later, December 20, 2007. The order invoked P.R. Laws Ann. tit. 3, § 2167, which is entitled "[e]mergency adjudicatory procedure." This provision allows for administrative agencies to "use emergency adjudicatory procedures in any situation in which there is imminent danger to the public health, safety and welfare or which requires immediate action by the agency." Id. § 2167(a). The statute requires that "[a]fter an order or resolution is issued according to this section, the agency shall promptly proceed to complete any procedure that has been required, unless there is imminent danger." Id. § 2167(e).

Absent an emergency, different procedures are to be followed with full formal hearings. These procedures require notice, the right to introduce evidence, an impartial adjudication, and a decision based on the record in the case. See id. § 2151 (outlining the rights that "shall be safeguarded in any formal

-11-

adjudicatory procedure before an agency"); id. § 2163 (outlining the procedure for an adjudicatory hearing).

ARPE stated two justifications for its invocation of the emergency procedure statute in its order to show cause. First, ARPE found that the Secretary of Justice's conclusion that some of the land was in the public domain "evidenced the existence of great public interest in the reevaluation" of the permits ARPE had granted and emergency procedures were needed "in order to safeguard the rights of both the proponents and the developers and the resources of the People of Puerto Rico." Second, ARPE found that "[t]here have also been several incidents that could affect the safety of the employees working on this project, and of the citizens who have been holding demonstrations near said land."

On December 19, 2007, before the ARPE hearing, SGCP filed a complaint to quiet title in the local court of first instance, seeking a declaratory judgment that SGCP held lawful title to the disputed portions of the land that were the subject of the Secretary's opinion.

The ARPE hearing on the order to show cause took place before two examiners on December 20th. At the outset, one examiner explained that the hearing was "not adversarial," and instead would be focused on "gather[ing] information" so that ARPE could "make a determination regarding the Stay Order of the construction[]" at

the project.  In addition, the examiner made clear that there was no issue as to the validity of SCGP's permits of themselves.

SGCP submitted a motion to dismiss, which argued that ARPE had no jurisdiction because only the Puerto Rico courts could adjudicate who held valid title to the land and that the ARPE proceeding was unnecessary as there was no issue regarding the validity of SGCP's permits or SGCP's compliance with those permits.[7]

This motion to dismiss was denied at the hearing.  One examiner explained that ARPE was not adjudicating the title question, but rather that because there was "doubt" over whether SGCP properly owned some of the land, and because ARPE could only issue permits to those who had rightful title, ARPE was proposing "to take cautious measures."  The examiner made clear that this "cautious measure[]" consisted of a "provisional stay" of construction, pending resolution of the litigation over the question of title in the Puerto Rico courts, and that the permits were not being revoked.

SGCP also argued that the hearing was an adjudicative hearing, and the hearing offended its due process rights because the notice was too vague and it had unreasonably short notice to prepare for the hearing.  ARPE noted the objection for the record.

_____

[7] There is no indication that SGCP argued that the emergency adjudicative procedures were not properly invoked because there was no "imminent danger."

SGCP apparently did not argue that the hearing had to be a full adjudicative hearing. Rather, its main position was that the agency should hold no hearing at all, or should have given it more notice and time.

A week later, on December 27, 2007, ARPE issued a Resolution and Order suspending SGCP's permits and halting construction for a period of sixty days, with the ability to extend the term if necessary "in the public interest." The order first noted that the Secretary of Justice's opinion "casts substantial doubt on the ownership of the land." ARPE found a stay of construction justified given this substantial doubt, in order to protect the public interest; namely to avoid any harm to SGCP, the public, or the land while the issue of title was resolved. ARPE explained that it had the authority to revoke permits if they were obtained by error or fraud, which includes circumstances where the permittee lacks title, but that it would not revoke the permits at this time, and instead would wait for the courts to decide the title issue. ARPE also rejected SGCP's due process notice and timing argument, saying that while it would leave the title determination to the courts, there was a substantial public interest in whether the land was public domain which warranted the use of § 2167 to shorten the fifteen-day time typically required between notice and the holding of a hearing, P.R. Laws Ann. tit. 3, § 2159. ARPE stated a second ground for prompt action and issuance

-14-

of the stay, concluding that these circumstances, including "the public demonstrations and aggression by different society groups," were "a matter of enough urgency" to call for immediate action and to warrant invoking the emergency procedure statute. ARPE then suspended the permits and ordered a stay of construction for sixty days. ARPE did not schedule another hearing, perhaps concluding, correctly as it turned out, that SGCP would promptly obtain review by the Puerto Rico courts of both the title question and of ARPE's own actions. Indeed, ARPE's order noted that it "may be subject to review by the Court of Appeals."

SGCP complied with the permit suspension; part of the project was then nearing completion of its final stages. SGCP had invested approximately $200 million in the project.

SGCP promptly appealed ARPE's order to the Puerto Rico Court of Appeals, which issued an opinion on February 6, 2008. San Gerónimo Caribe Project, Inc. v. Administración de Reglamentos y Permisos, KLRA200800010, 2008 WL 1744564 (P.R. Cir. Feb. 6, 2008) (certified translation provided by the parties). The court upheld ARPE's stay order and the exercise of its emergency power. It also directed that ARPE, having properly issued the stay, should hold a full adjudicative hearing on the permit suspension question as soon as possible. The court also held that, under Puerto Rico law, ARPE had the authority to investigate whether permits had been erroneously granted, and to order a stay of construction, without

-15-

needing to commence a judicial proceeding. As to the due process claim, the court, applying Puerto Rico Supreme Court precedent, found that ARPE did not err in invoking the emergency adjudication procedures. The court also found that there was no error in ARPE ordering the stay, as the Secretary of Justice opinion was "binding" on agencies of the executive branch.

The court also held that ARPE had erred in failing to promptly schedule a full adjudicative hearing for SGCP after it had ordered the stay, and that this failure (but not ARPE's issuance of the stay under the emergency procedure) was in violation of SGCP's due process rights. The court ordered that an evidentiary hearing be held "as soon as possible -- with all the guarantees of the due process of law," after which ARPE must reevaluate its initial order. This hearing never took place in light of further and prompt actions by the Puerto Rico courts. SGCP filed a petition for certiorari from the appeals court decision with the Puerto Rico Supreme Court on February 15, 2008, nine days after the appeals court's decision.

On February 8, 2008, in the separate court proceeding brought by SGCP to quiet title, the court of first instance entered judgment finding that SGCP was the valid owner of all the properties underlying the Paseo Caribe Project. The court rejected the arguments contained in the Secretary's opinion as to why the

land was part of the public domain. This was appealed to the Puerto Rico Supreme Court.

On February 25, 2008, with the initial sixty-day suspension soon to expire and the petition for certiorari as to the court of appeals's decision pending before the Supreme Court, ARPE entered a second order extending the suspension of SGCP's permits for another sixty-day period. ARPE reasoned that "the factual situation" regarding the project remained the same, and it was extending the stay in light of the "absence of a final ruling on whether the land reclaimed from the sea in this case is public property." The order also noted that SGCP could "request a formal administrative hearing," which would be scheduled "as soon as possible" after any such request. SGCP does not contend it requested such a hearing, nor is there any evidence in the record that such a hearing was requested.

Acting quickly, on February 28, 2008, the Puerto Rico Supreme Court granted SGCP's petition for a writ of certiorari and issued an opinion. San Gerónimo Caribe Project, Inc. v. Administración de Reglamentos y Permisos, 173 P.R. Dec. 241 (2008) (certified translation provided by the parties). The court granted SGCP's motion for a stay of the (extended) suspension ordered by ARPE and allowed SGCP to resume construction, which SGCP did shortly after the stay was granted. The court found that ARPE's February 25 order extending the suspension contravened the judgment

-17-

of the Puerto Rico court of first instance that SGCP possessed valid title to the disputed parcels.  The total period of time from the initial suspension order to the Supreme Court's vacating of the suspension was sixty-three days.  At a later date, the court also granted a petition for certiorari with respect to the separate appeal taken from the court of first instance judgment holding that SGCP had valid title to the land.

On July 31, 2008, the Puerto Rico Supreme Court issued two opinions on the merits of the two cases.  In a lengthy opinion it affirmed the decision of the court of first instance, over one dissent, holding that SGCP had rightful title to the lands underlying the Paseo Caribe project.  San Gerónimo Caribe Project, Inc. v. Estado Libre Asociado de P.R., 174 P.R. Dec. 518 (2008) (certified translation provided by the parties).  This opinion also stressed that the Fortín San Gerónimo "is a public domain good property of the People of Puerto Rico," that public access to the Fort was necessary "for the use and enjoyment by the general public," and that nothing prevented SGCP from granting a deed of access, which it apparently had not done.[8]

_____

[8]  Thereafter, the Commonwealth sought reconsideration of the Supreme Court opinion holding that title belonged to SGCP.  The court denied reconsideration on August 20, 2008.  San Gerónimo Caribe Project, Inc. v. Estado Libre Asociado de P.R., 174 P.R. Dec. 766 (2008) (certified translation provided by the parties).  In its denial, the court made clear that its decision was limited to "the controversy on the juridic classification of the land reclaimed from the sea" in two parcels of land, did not address independent concerns arising out of an investigation of the project

Second, the court issued an opinion holding, in a 3-2 decision, that ARPE had violated SGCP's due process rights under Commonwealth law by suspending the permits without an adjudicatory predeprivation hearing. San Gerónimo Caribe Project, Inc. v. Administración de Reglamentos y Permisos, 174 P.R. Dec. 640 (2008) (certified translation provided by the parties). As factual background, the court stated that groups opposed to the project had engaged in demonstrations there, claiming that the construction work had impeded the public access to the Fortín, and this had led the Federal and Consumer Affairs Commission of the Puerto Rico Senate to start an investigation on June 22, 2006. The Department of Justice had then started its own investigation, including of the permit-granting process for the project and adjoining lands.

Recognizing that SGCP had a property interest in the permit, the court noted that where the "Government must act quickly to guarantee order, safety or health of its citizens" or in other "extraordinary" situations that "require immediate action," the government may use summary procedures. The court explained that "the guiding criteria must be whether the delay that entails

---

by the Commonwealth, and did not preclude any other judicial or administrative action arising from the investigation. The concurring opinion of Chief Justice Hernández Denton made clear that the decision "in no way should be interpreted as granting legality and impunity in favor of the multiple juridic transaction that occurred regarding said land in the 1990's," including the legality of those transactions or the "correction of the boundaries reclaimed from the sea."

starting an ordinary procedure would al[l]ow the happening, precisely, of what the summary action intends to avoid."

The court found, disagreeing with both the appeals court and ARPE, that this standard was not satisfied. The court did recognize that a "public interest" existed with respect to the ownership question, but said that the justification provided by ARPE for invoking the emergency procedures was "very far from the extraordinary circumstances that would allow the use of the immediate action procedure contemplated" in the statute. The court rejected the argument that the public protests over the project themselves justified the use of summary procedures, finding that "the degree of unrest . . . would not equal the instances where the compliance with the imminent danger to public health, safety and welfare have been acknowledged," and emphasizing that protests can be controlled without harming general safety. It said "ARPE made a mistake" in invoking the emergency procedure statute, because "the particular circumstances of this case do not present an imminent danger to the public health, safety and well being."

The court then found that ARPE's justification for suspending the permits was insufficient, holding that "substantial doubt" about the validity of SGCP's title was not a sufficient basis under the relevant statutes and regulations to suspend the permits. The court entered judgment permanently revoking ARPE's

permit suspension order, and ordered ARPE to permanently halt its permit revocation proceedings.

Two justices dissented. One found that the majority did not "provide an objective balance between the affected individual's interest and the protected governmental" interests, and specifically failed to "take into consideration the legitimate interest that the State has in preventing the imminent construction of a permanent building over possible public property."

B.        Federal Case Procedural History

SGCP filed this suit on October 24, 2008, naming as defendants the Governor of Puerto Rico, the Secretary of Justice, the head of ARPE, and other unnamed individuals. The complaint raised four claims: (1) violation of federal procedural due process rights, (2) violation of federal substantive due process rights, (3) violation of the Equal Protection Clause of the Fourteenth Amendment, and (4) violation of 42 U.S.C. § 1983, based on the preceding three claims, in addition to pendent state-law claims. As to relief, the complaint requested a declaratory judgment that the defendants each violated SGCP's rights, and an award of $38 million in compensatory damages, as well as punitive damages and attorneys' fees and costs. The defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). They argued that the complaint failed to state a claim of a procedural due process

violation or other violations and, even if it did, the defendants were entitled to qualified immunity.

The district court referred the motion to a magistrate judge. On August 3, 2009, the magistrate judge issued a report and recommendation, recommending that the motion to dismiss be granted. SGCP filed objections to the report and recommendation.

On September 30, 2009, the district court adopted the magistrate judge's report and recommendation and granted the defendants' motion to dismiss. San Gerónimo Caribe Project, 663 F. Supp. 2d at 69. The district court found that the Parratt-Hudson doctrine barred plaintiff's procedural due process claims. Id. at 64-65. The court also found that qualified immunity would apply. Id. at 66-68. The district court rejected SGCP's remaining federal claims and declined to exercise supplemental jurisdiction over the state-law claims. Id. at 68-69.

SGCP's appeal raises only an objection to the dismissal of its federal procedural due process claim and to the grant of immunity.

II.

We review de novo the grant of a motion to dismiss under Rule 12(b)(6). Feliciano-Hernández v. Pereira-Castillo, 663 F.3d 527, 532 (1st Cir. 2011), cert. denied, 80 U.S.L.W. 3678 (U.S. 2012).

SGCP does not raise any challenge to the emergency procedure statute, P.R. Laws Ann. tit. 3, § 2167, itself. There is no claim that any "established state procedure" deprived it of property without due process. Logan v. Zimmerman Brush Co., 455 U.S. 422, 436 (1982). As to the claim it does make, all agree that SGCP has a protected property interest and the defendants acted under color of state law. See id. at 428 (explaining that the procedural due process inquiry is "whether [plaintiff] was deprived of a protected interest, and, if so, what process was his due"); González-Droz v. González-Colón, 660 F.3d 1, 13 (1st Cir. 2011) (stating the elements of a procedural due process claim).

The issue is whether on these facts SGCP has raised a viable claim of deprivation of its federal procedural due process rights as those rights have been articulated in the Parratt-Hudson doctrine and in Zinermon, 494 U.S. 113.[9] SGCP's primary theory is that the "circumstances of this case" -- ARPE's impropriety in invoking the emergency procedure statute to issue a stay -- "are governed by Zinermon" and not the Parratt-Hudson doctrine.[10] We

---

[9] We appreciate the assistance provided by amici curiae the Commonwealth of Massachusetts and the States of Maine and New Hampshire.

[10] To be clear, in this federal suit, the defendants do not challenge the Puerto Rico Supreme Court's determination that the hearing did not comply with Puerto Rico law and did not comply with due process. Instead they argue that even so, no cause of action for a remedy for a procedural due process claim is stated under the federal constitution.

-23-

outline the Parratt-Hudson doctrine before turning to SGCP's claim that Zinermon requires finding Parratt-Hudson inapplicable on these facts.

A.        The *Parratt-Hudson* Doctrine

In Parratt v. Taylor, 451 U.S. 527 (1981), the Court held that no predeprivation process was required where a state prison guard negligently destroyed a prisoner's property, so long as adequate postdeprivation remedies were available.[11] The Court explained that "either the necessity of quick action by the State or the impracticability of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process." Id. at 539. The Court concluded that "the loss is not a result of some established state procedure and the State cannot predict precisely when the loss will occur. It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place." Id. at 541.

_____

[11] The Court also held that there was no "express requirement of a particular state of mind" for a procedural due process claim to be maintained under 42 U.S.C. § 1983. Parratt v. Taylor, 451 U.S. 527, 535 (1981). That portion of Parratt was later "overrule[d] . . . to the extent that it states that mere lack of due care by a state official may 'deprive' an individual of life, liberty, or property under the Fourteenth Amendment." Daniels v. Williams, 474 U.S. 327, 330-31 (1986).

-24-

In Hudson v. Palmer, 468 U.S. 517 (1984), the Court extended Parratt to intentional destruction of property by a state prison guard, explaining that "when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur." Id. at 533. Whether the state employee knew in advance of the deprivation was irrelevant; instead "[t]he controlling inquiry is solely whether the state is in a position to provide for predeprivation process." Id. at 534.

In Zinermon v. Burch, 494 U.S. 113 (1990), the Court found that Parratt-Hudson did not apply to an improper voluntary admission of a patient to a mental health facility under a Florida statute. There, Burch arrived at a mental health facility hallucinating, confused, psychotic, and believing he was in heaven. Id. at 118. He was provided with forms to sign giving his consent to admission and treatment, and did so, resulting in his admission under Florida's statutory provisions for "voluntary" admission. Id. at 118, 122. These allowed for a patient to be admitted if the patient gave express and informed consent, which was defined as requiring the patient to "make a knowing and willful decision." Id. at 123. A post-release investigation and examination found that Burch was probably not competent to sign the form and he then brought his federal suit. Id. at 120.

-25-

Florida did have other methods of admission. The consequences of the use of the voluntary procedure rather than other procedures were considerable. Depending on which type of admission was involved, the procedures and the duration of admission changed.[12] The substantive standard for the different forms of admission differed as well. For example, a patient could only be involuntarily admitted if likely "to injure himself or others," or if a lack of care or treatment would result in "neglect or refusal to care for himself" that amounted to a "real and present threat of substantial harm to his well-being." Id. at 122. By contrast, voluntary admission simply required "express and informed consent." Id. at 123. Burch alleged that he was deprived of procedural due process because he was admitted under the

_____

[12] One method allowed a short term emergency admission, which could last only forty-eight hours and required a judge, mental health professional, or law enforcement officer to admit the person only on a finding the person was mentally ill, and likely to injure himself or others, or was in need of care and lacked capacity to make a responsible application. Zinermon, 494 U.S. at 122. A different procedure allowed only a five-day commitment and required a court order before admission, which had to make certain findings about likelihood of injury to the patient or others, or find that a lack of care would result in a "real and present threat of substantial harm" to the patient. Id. There was another process for involuntary admission which required the facility administrator and two mental health professionals to recommend involuntary placement, and then required a judicial hearing with notice, appointed counsel, and access to medical records, as well as an independent examination, to determine whether the patient was competent to consent to treatment and, if not, the appointment of a guardian advocate to make treatment decisions. Id. at 122-23. Involuntary placement could last for up to six months, after which time the facility must either release the patient or seek a court order for continuing placement. Id. at 123.

voluntary consent procedures, even though it should have been clear that he was not of sufficiently sound state of mind at the time he was admitted to be able to voluntarily consent to admission. Id. at 115, 123.

The Court, in a 5-4 decision, agreed with Burch that his complaint stated a claim. The Court found that the Florida statute provided "little guidance" on which procedure to use when admitting patients, id. at 135, and instead provided "broadly delegated, uncircumscribed power" to officials admitting patients, id. at 136. The Court explained that Florida delegated "a broad power to admit patients" to the facility, and that "[b]ecause [the hospital officials] had state authority to deprive persons of liberty, the Constitution imposed on them the State's concomitant duty to see that no deprivation occur without adequate procedural protections." Id. at 135. Important to the Court's analysis was that the statute could easily have contained additional safeguards, such as a requirement that admissions staff "determine whether a person is competent to give consent" before allowing voluntary admission. Id.

The Court also advanced "three basic reasons" for finding Parratt-Hudson inapplicable. Id. at 136. First, the risk of deprivation of liberty was predictable and was so as to the particular point in the admission process when the deprivation would occur. Id. The Court found that "the very nature of mental

-27-

illness makes it foreseeable that a person needing mental health care will be unable to" provide informed consent, and so there was a clear and easily foreseeable risk that some individuals would be wrongly placed into treatment if allowed to sign in voluntarily without some threshold determination of competency. Id. at 133, 136.

Second, since Florida already had an established procedure for involuntary placement, "we cannot say that predeprivation process was impossible here." Id. at 136. This was in contrast to Parratt in which it would have made no sense for a state to tell its employees not to make a mistake as to losing mail and it would be absurd to hold a hearing on whether employees should make a mistake. Id. at 137. A state could not anticipate or control in Parratt and in Hudson when such mistakes would be made, whether the mistakes were negligent or intentional.

Third, the conduct of the state officials was not "unauthorized" in the sense used in Parratt and Hudson, for two reasons. Id. at 138. First, in those cases the defendant guards did not have broad authority from the state to commit the negligent and intentional deprivations that they did. Id. Second, the Zinermon Court stressed that the defendants were dealing with persons "unable to protect their own interests." Id.

The Supreme Court has not addressed the Parratt-Hudson doctrine since. Still, Justices Kennedy and Thomas, concurring in

-28-

Albright v. Oliver, 510 U.S. 266 (1994), set forth their views that the Parratt-Hudson doctrine stands for the proposition that "[i]n the ordinary case where an injury has been caused not by a state law, policy, or procedure, but by a random and unauthorized act that can be remedied by state law, there is no basis for [federal court] intervention under § 1983," in a suit alleging only a procedural due process claim. Id. at 285 (Kennedy, J., concurring in the judgment). This "commonsense teaching" is designed to "respect[] the delicate balance between state and federal courts," and to ensure that the Due Process Clause of the Fourteenth Amendment does not turn into "a font of tort law to be superimposed upon whatever systems may already be administered by the States." Id. at 284 (quoting Parratt, 451 U.S. at 544) (internal quotation mark omitted).

B.      Application of *Parratt-Hudson*

SGCP contends that "not all conduct by state officials that violates state law falls within the 'random and unauthorized' doctrine." It argues that the conduct here does not fall within Parratt-Hudson for three reasons. First, like Zinermon, these officials had authority to effect the deprivation complained of. Second, like Zinermon, it is predictable that where government officials have to choose one or another of two or more protocols, there will be mistakes which will result in denials of due process. Third, "and most important, . . . the state could have done more to

-29-

guide its officials' choice between available procedural protocols under circumstances in which a correct choice would have satisfied the Constitution but an incorrect choice did not."  For this last proposition it relies on the Puerto Rico Supreme Court's acknowledgment that the statute itself "does not provide definitions nor guidelines to precisely state what situations or circumstances justify an agency [to deviate] from the ordinary adjudicative process to invoke" the emergency procedure.  These three arguments are derived directly from the Zinermon Court's "three basic reasons" for finding the Parratt-Hudson doctrine inapplicable.  494 U.S. at 136.  We disagree on each point and find the Parratt-Hudson doctrine applies here.

We outline the emergency procedure statute at issue here before turning to SGCP's arguments.  The statute is entitled "[e]mergency adjudicatory procedure," and allows agencies to "use emergency adjudicatory procedures in any situation in which there is imminent danger to the public health, safety and welfare or which requires immediate action by the agency."  P.R. Laws Ann. tit. 3, § 2167(a). Agencies "may only take such action as it is necessary within the circumstances described in the above subsection (a) which justifies the use of emergency adjudicatory procedures."  Id. § 2167(b).  Before emergency procedures under subsection (a) may be used, the agency must "issue an order or resolution that shall include a concise determination of the

-30-

findings of fact, conclusions of law, and the reasons of public policy that justify the agency's decision to take specific action." Id. § 2167(c).  When the emergency procedures are invoked, the agency must give notice "to those persons who are required to comply with the order or resolution," which order or resolution becomes "effective upon being issued."  Id. § 2167(d). Furthermore, unlike under the Florida statute at issue in Zinermon, after invoking the emergency procedure statute the agency must "promptly proceed to complete any procedure that has been required, unless there is imminent danger."  Id. § 2167(e).

The emergency procedure statute at issue, on its own language, is explicitly an exception to the general rule requiring full predeprivation process, and it requires a finding that a triggering condition -- an emergency rising to certain levels -- in subsection (a) is satisfied.  Section 2167 is a limited exception to the general requirement that procedural due process protections be provided "in any formal adjudicatory procedure before an agency."  Id. § 2151.[13]  Moreover, § 2167 requires the agency invoking emergency procedures to issue an order justifying its use of such procedures.  Id. § 2167(c).

These differences alone cast doubt on whether Zinermon could apply here, even if the triggering conditions themselves

---

[13]  That it is an exception is further reinforced by subsections (b) and (e) of § 2167.

require some exercise in judgment by agencies in determining when to invoke them.  <u>Zinermon</u> did not involve a use of statutory emergency procedures.  Further, <u>Zinermon</u> did not involve a triggering requirement that there be a finding that an individual was competent before admitting an individual under the voluntary admission procedure.  Indeed, that was exactly the flaw in the procedure. <u>See</u> <u>Zinermon</u>, 494 U.S. at 135 (noting that the Florida law "do[es] not direct any member of the facility staff to determine whether a person is competent to give consent, nor to initiate the involuntary placement procedure for every incompetent patient").  Moreover, in <u>Zinermon</u>, no guidance at all was provided as to when to use voluntary as opposed to involuntary procedures. <u>See</u> <u>id.</u>  These distinctions alone are important.

    1.    <u>Discretion Provided by the Statute</u>

SGCP's first claim is that the statutory language defining what qualifies as emergency conditions justifying invocation of the emergency procedure statute does not sufficiently cabin the discretion of administrative agencies and so this case falls within <u>Zinermon</u>.

We reject SGCP's argument. The scope of discretion conferred on agencies in determining when to use emergency procedures under § 2167 is not equivalent to the completely uncircumscribed discretion to use voluntary admission procedures that existed in <u>Zinermon</u>.

There can be no serious argument that the required triggering finding of "imminent danger to the public health, safety and welfare" grants excessive discretion. Emergency procedure statutes similar to the one at issue here are widespread in this country. Puerto Rico's emergency procedure statute is modeled on a section of the 1981 Model State Administrative Procedure Act. Subsection (a) of that section provides that "[a]n agency may use emergency adjudicative proceedings in a situation involving an immediate danger to the public health, safety, or welfare requiring immediate agency action." 1981 Model State Admin. P. Act, § 4-501(a). A number of states have enacted centralized emergency procedure provisions similar to that of the model act and the Puerto Rico law. See, e.g., Cal. Gov't Code § 11460.30(a); Idaho Code Ann. § 67-5247(1); Iowa Code Ann. § 17A.18A(1); Kan. Stat. Ann. § 77-536(a); N.D. Cent. Code Ann. § 28-32-32; Wash. Rev. Code Ann. § 34.05.479(1). It cannot be, as the logic of SGCP's argument would have it, that these statutes vest so much discretion in state officials that they would be vulnerable to suit under Zinermon for mistaken applications.

Indeed, the Supreme Court upheld a similar, but not identical, emergency procedure statute against a due process challenge in Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S. 264 (1981). The Court upheld provisions of the Surface Mining Control and Reclamation Act that allowed the Secretary of

the Interior to order immediate cessation of activities with no predeprivation process if two criteria were met. Id. at 298. First, the mining operation must violate the Act or a permit condition required by the Act. Id. Second, the secretary must determine that the operation "creates an immediate danger to the health or safety of the public, or is causing, or can reasonably be expected to cause significant, imminent environmental harm to land, air or water resources." Id. The Act defined "imminent danger to the health and safety of the public" as the existence of a condition or practice that could "[r]easonably be expected to cause substantial physical harm to persons outside the permit area before such condition, practice, or violation can be abated." Id. at 301 (alteration in original). The Court found that these standards were easily "specific enough to control governmental action and reduce the risk of erroneous deprivation," id. at 301, and that "[i]f anything, these standards are more specific than the criteria in other statutes authorizing summary administrative action that have been upheld against due process challenges," id. at 302.

Given Hodel, at oral argument before the en banc court SGCP argued for the first time that its claim that the emergency statute at issue here conferred too much discretion was largely based on other statutory language -- the language allowing emergency procedures to be invoked in any situation "which requires immediate action by the agency," which follows after the language

-34-

requiring that there be "imminent danger to the public health, safety and welfare."  P.R. Laws Ann. tit. 3, § 2167(a).  SGCP claimed the "or which requires immediate action" clause is to be read as having an independent meaning from the "imminent danger to the public health, safety and welfare" clause and does not provide any guidance to state officials.  SGCP did not make this argument to the district court or in its appeal to the panel.  It did not brief this issue even before the en banc court.  We have found no support for this anywhere in Puerto Rico law, and the argument is contrary to Puerto Rico law.  SGCP further argued that the Puerto Rico Supreme Court had not, before its decision in this case, adopted sufficient limiting principles to cure this deficiency.  This is also not so.

There is no deficiency resulting from the "or which requires immediate action" clause.  SGCP's new argument[14] fails for many reasons, beyond waiver.  It is not supported by rules of statutory construction, it is contrary to judicial interpretation, and in fact that reading of the statute was not the basis for the decision here.  No Puerto Rico case has interpreted the clause as independent and unrelated to the imminent danger clause.  It is

_____

[14]  SGCP also made a new argument about the term welfare.  The term "welfare" in the phrase "public health, safety and welfare" is not so vague as to confer too much discretion so as to fall within Zinermon.  Indeed, the word "welfare" is used in the conjunctive here; the statute requires a danger to public health, safety, and welfare before emergency procedures can be invoked, P.R. Laws Ann. tit. 3, § 2167(a).

clear that this portion of the statute, when interpreted in light of the statute as a whole, earlier Puerto Rico court decisions, and the circumstances of this case, did not amount to the type of grant of broad and standardless discretion in <u>Zinermon</u>.

First, the construction of the statute itself does not support SGCP's argument. As SGCP conceded at oral argument, this portion of the statute must be construed in light of the preceding portion, which allows for emergency procedures to be used only where there is an "imminent danger to the public health, safety and welfare." P.R. Laws Ann. tit. 3, § 2167(a). This is particularly so given that this language is within a statute entitled "[e]mergency adjudicatory procedure" and outlines when "emergency adjudicatory procedures" can be used. <u>Id.</u> (emphasis added). Other portions of the statute make clear that the emergency procedures of subsection (a) are to be used only in narrow circumstances.[15] As

_____

[15] Subsection (b) of the statute provides that "[t]he agency may only take such action as it is necessary within the circumstances described in the above subsection (a) which justifies the use of emergency adjudicatory procedures." P.R. Laws Ann. tit. 3, § 2167(b). Summary procedures are only justified to the extent that they are necessary in light of the conditions specified in subsection (a), supporting a narrow interpretation of emergency authority outlined in subsection (a). The Puerto Rico Supreme Court referenced this section in explaining that "the emergency adjudicative procedure started by the agency must be limited to what is necessary, under the light of what the dangerous or extraordinary situation would require[]." <u>San Gerónimo Caribe Project, Inc.</u> v. <u>Administración de Reglamentos y Permisos</u>, 174 P.R. Dec. 640 (2008) (certified translation provided by the parties)
Moreover, subsection (e) of the statute provides that "[a]fter an order or resolution is issued according to this section, the agency shall promptly proceed to complete any

a result, an official considering the clause after the word "or" would construe it to reach only circumstances of comparable gravity. Cf. Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979) ("Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise . . . ." (emphasis added)); Mizrahi v. Gonzales, 492 F.3d 156, 164 (2d Cir. 2007) ("It is a standard canon of statutory construction that words separated by the disjunctive are intended to convey different meanings unless the context indicates otherwise."); see also Lawson v. FMR LLC, 670 F.3d 61, 68 (1st Cir. 2012) (courts consider "the broader statutory framework, including particularly the nearby language, and the title and caption" in construing terms of a statute (citations omitted)).

Judicial construction of the statute also precludes SGCP's broad reading of the "or" clause as well as its attack on the imminent danger clause. The emergency procedure statute was enacted, in 1988, against a backdrop of Puerto Rico Supreme Court precedent which reads in limiting principles to statutes authorizing summary action in order to ensure that those statutes

---

procedure that has been required, unless there is imminent danger." P.R. Laws Ann. tit. 3, § 2167(e). Subsection (e) limits the use of emergency procedures after they have been invoked to situations of "imminent danger," and applies to the triggering conditions of subsection (a). Situations that require "immediate action by the agency" are most reasonably read as limited to situations of "imminent danger" equivalent in kind to "imminent danger to the public health, safety and welfare."

comply with both Puerto Rico's due process clause and the Fourteenth Amendment's Due Process Clause. Other cases decided after the statute's enactment similarly emphasize that summary action is justified only in narrow circumstances.

The Puerto Rico Supreme Court opinion in this case does explain, as SGCP argues, that the statutory language of § 2167 does not "precisely state what situations or circumstances justify" summary procedures, but it also says "[n]evertheless, on prior occasions we have had the opportunity to precisely measure the scope of the 'emergency' concept." The court relied on, and quoted liberally from, this precedent in explaining that § 2167 only justifies the use of summary procedures if there are "extraordinary" circumstances that would "imply the existence of a[n] imminent danger for public health, safety and welfare," and that "the guiding criteria must be whether the delay that entails starting an ordinary procedure would al[l]ow the happening, precisely, of what the summary action intends to avoid." The Supreme Court relied on and did not overrule any precedent in reaching this conclusion.

A number of Puerto Rico Court of Appeals decisions also construed § 2167 narrowly well before ARPE invoked the statute here. Most notably, a 2001 opinion explained that "[e]xcept in situations of a true emergency, the agency is obligated to hold a hearing with all the rights" outlined by P.R. Laws Ann. tit. 3,

§ 2151, and held that because "[i]n the case at hand, such an emergency situation did not exist," the agency's issuance of an order under § 2167 violated due process of law.  El Comandante Mgmt. Co. v. Confederación Hípica de P.R., No. JH-01-47, 2001 WL 1850793 (P.R. Cir. Dec. 17, 2001) (emphasis added) (translation provided by U.S. District of Puerto Rico interpreters).  Several other appellate decisions also explained that § 2167 is an exception to be used only in emergency situations.[16]

Contrary to SGCP's argument, even before the Puerto Rico Supreme Court's decision in this case, Puerto Rico had provided judicial and statutory guidance in construing the "immediate

---

[16] See Perez Perdomo v. Respi-Care of P.R., Inc., No. KLRA050224, 2005 WL 2481385 (P.R. Cir. Aug. 11, 2005) (noting that § 2167 is an "exception" to the normal requirement of a predeprivation hearing, quoting a treatise explaining that the use of § 2167 "is legitimized by the existence of a clear and imminent danger to the health, safety and wellbeing of the public which requires immediate action from the agency," and upholding a Department of Health regulation allowing summary procedures under § 2167 because "[i]t is clear that it only proceeds in emergency situations or when faced with the existence of imminent danger to the health and wellbeing of the citizens" (translation provided by U.S. District of Puerto Rico interpreters)); Torres Álamo v. Tribunal Examinador de Médicos, No. TEM-Q-2003-01, 2004 WL 2419420 (P.R. Cir. Sept. 30, 2004) (quoting the same language from the same treatise in a discussion of § 2167 (translation provided by U.S. District of Puerto Rico interpreters)); Triple C, Inc. v. Oficina del Procurador del Paciente Beneficiario de la Reforma de Salud, No. I03-01, 2003 WL 21369138 (P.R. Cir. Feb. 18, 2003) (finding an agency's action authorized under § 2167 where there was "an imminent danger to the health, life, and wellbeing" of certain patients, and explaining the Puerto Rico Supreme Court's due process precedent as authorizing action "without first providing the right to be heard when it is necessary to guarantee the order, safety and security of the people" (translation provided by U.S. District of Puerto Rico interpreters)).

action" portion of § 2167 as limited to emergency or other extraordinary situations of similar urgency.[17]

Moreover, the actions taken here were not in fact based on SGCP's hypothetical reading of the "or which requires immediate action" clause. Neither the ARPE, the Puerto Rico Court of Appeals, nor the Puerto Rico Supreme Court treated the "immediate action" portion of the statute as separate from the "health, safety and welfare" portion of the statute or reviewed ARPE's action as based on only the "immediate action" clause. ARPE's stated reasons relied on the imminent danger to health, safety, and welfare portion -- including the fact of ongoing public demonstrations, which required police intervention. Both ARPE and the Puerto Rico courts cited to subsection (a) of the emergency statute as a whole.

As a result, we reject the argument that the emergency statute allowed such unfettered discretion as to remove this case from the reach of Parratt-Hudson. ARPE was not provided with "broad power and little guidance," or "broadly delegated,

---

[17] SGCP contends that in suspending SGCP's permits ARPE cited and relied on for its emergency powers the statement in A.R.P.E. v. Ozores Perez, 16 P.R. Offic. Trans. 1005 (1986) (per curiam), that "it was the lawmaker's intent to grant broad policy-making discretion to [ARPE] in the formulation and maintenance of permit-processing proceedings." Id. Not so. ARPE did not cite that case in justifying its decision to use summary procedures; the case was cited to support that it did have jurisdiction and substantive authority to suspend the permits after they had already been granted.

uncircumscribed power."[18]  Zinermon, 494 U.S. at 135-36; see also Lolling v. Patterson, 966 F.2d 230, 234 n.6 (7th Cir. 1992) (Zinermon does not apply even where an official exercises "discretion and authority," so long as "that discretion was not 'uncircumscribed' or otherwise unregulated"); Charbonnet v. Lee, 951 F.2d 638, 644 (5th Cir. 1992) ("[T]he Zinermon majority found that the state actions before it were not 'unauthorized' only because the state had actually delegated its officials with the broad authority to carry out the deprivation alleged by Mr. Burch."); Easter House v. Felder, 910 F.2d 1387, 1400-01 (7th Cir. 1990) (en banc) (explaining that "the extent to which the state official's discretion is 'uncircumscribed' . . . appears to have been a decisive factor permitting the majority in Zinermon to rule that Parratt would not" apply, and holding that "exercis[ing] a certain amount of discretion and authority" does not mean that such discretion was uncircumscribed).  Sufficient guidance was provided

---

[18]  Our one decision to hold that a statute's delegation of authority was so broad and standardless as not to fall within Parratt-Hudson is Chmielinski v. Massachusetts, 513 F.3d 309 (1st Cir. 2008), and that case did not involve emergency procedures. There, we assessed a statute which required only that a termination hearing be "informal" in nature and provided no guidance at all on the procedures to be used.  Id. at 315.  We held that because "[n]either the statute nor the regulations set out any procedural requirements, providing only that the hearing be 'informal,'" the hearing that the plaintiff received "cannot be characterized as a deviation from the state law."  Id. (emphasis added).  The emergency statute at issue here provides far more guidance than that at issue in Chmielinski and here there was a deviation from state law.  SGCP is wrong that Chmielinski supports its cause.

to ARPE, and ARPE's discretion was so limited, such that this case does not fall within <u>Zinermon</u>.

Moreover, the view of this court has long been that <u>Zinermon</u> is best viewed as a case where the state statutory scheme conferred so much discretion on state officials so as to authorize the state officials' actions in deprivation of procedural rights. <u>See</u> <u>Herwins</u> v. <u>City of Revere</u>, 163 F.3d 15, 19 (1st Cir. 1998) (in <u>Zinermon</u> "the procedure was itself authorized by state law"); <u>see also</u> <u>Mard</u> v. <u>Town of Amherst</u>, 350 F.3d 184, 194 n.4 (1st Cir. 2003) (same); <u>O'Neill</u> v. <u>Baker</u>, 210 F.3d 41, 50 (1st Cir. 2000) ("In <u>Herwins</u>, we viewed <u>Zinermon</u> as a case in which state law <u>did</u> authorize the procedure followed (albeit unconstitutionally), so that the act of the officials could not be described as 'random and unauthorized' . . . ."). We therefore reject SGCP's opening premise that <u>Zinermon</u> involved a case of violation of state law. Here, the state statutory scheme did not authorize ARPE's actions, and a mere mistake by officials in exceeding the limits of their defined authority is not the stuff of a federal due process claim.

2. <u>Foreseeability of a Deprivation</u>

SGCP's second claim is that the deprivation at issue here was "foreseeable" as opposed to "random" because, like <u>Zinermon</u>, it is predictable that where government officials have to choose one or another of two or more protocols, there will be mistakes which will result in denials of due process.

We reject SGCP's claim that all it needs to do to fit under Zinermon is show that it was foreseeable that officials could make mistakes and as a result of those mistakes, there would be deprivations of due process. SGCP's argument fundamentally misapprehends the foreseeability and predictability aspect of Zinermon's distinguishing of Parratt-Hudson. Zinermon cannot be reduced to the proposition that whenever there is risk of error, the protections afforded by Parratt-Hudson do not apply. As Alexander Pope wrote, "to err is human." The Zinermon Court likewise did not rule that every time an agency must make a choice between sets of procedures Parratt-Hudson does not apply.

In Zinermon, the risk of an erroneous non-emergency commitment of an individual who had not been shown to be a danger to himself or others was different in kind than the risk present here. There, it was perfectly obvious that some individuals seeking non-emergency admission at a mental health facility would not be competent to give consent to admission. Zinermon, 494 U.S. at 133 ("Indeed, the very nature of mental illness makes it foreseeable that a person needing mental health care . . . will be unable 'to make a knowing and willful decision' whether to consent to admission."). Given this clear risk, it was predictable that individuals would be admitted under the voluntary admission procedure, even though they were not competent to give consent, because the statute did not require a threshold determination of

-43-

competency.  Id. at 135 ("[T]he statutes do not direct any member of the facility staff to determine whether a person is competent to give consent, nor to initiate the involuntary placement procedure for every incompetent patient.").  That was why the Zinermon Court explained that the risk of an erroneous deprivation was "predictable."  Id. at 136 ("It is hardly unforeseeable that a person requesting treatment for mental illness might be incapable of informed consent, and that state officials with the power to admit patients might take their apparent willingness to be admitted at face value and not initiate involuntary placement procedures.").  There was nothing comparable here to the Zinermon foreseeability that the statute created a substantial risk of erroneous admissions by failing to first require a determination that someone visibly mentally ill was competent to voluntarily admit himself.

Our conclusion is consistent with that of other circuits. See Caine v. Hardy, 943 F.2d 1406, 1413 (5th Cir. 1991) (en banc) (explaining Zinermon applies only where, among other conditions, "the particular pre-deprivation administrative procedure presents a high risk of erroneous deprivation"); Easter House, 910 F.2d at 1401 ("The Court's concern in Zinermon focused on the broadly delegated authority which the state statute gave the doctors to effect the deprivation at issue and the subsequent failure of that same statute to provide for effective pre-deprivation safeguards. It was in view of this statutory oversight that the Court concluded

-44-

that the deprivation which occurred was 'predictable' and, as such, not 'random.'").

### 3. Additional Predeprivation Safeguards

We also note that <u>Zinermon</u> does not govern here because, unlike in <u>Zinermon</u>, there is no practicable additional predeprivation process that could be implemented. <u>See</u> <u>Zinermon</u>, 494 U.S. at 132-33 ("To determine whether . . . the <u>Parratt</u> rule [applies] . . . we must ask whether predeprivation procedural safeguards could address the risk of deprivations of the kind Burch alleges."). In <u>Zinermon</u> there existed a straightforward cure for the statutory failing: the state could have easily imposed a requirement that a threshold determination of competency take place, so that involuntary commitment procedures would be used for patients who, though willing to give consent, were in fact unable to give valid consent due to their mental health condition. <u>Id.</u> at 136-37. This determination was critical to the court's holding. <u>See</u> <u>id.</u> at 137 (explaining that "[t]he problem is only to ensure that [the involuntary placement] procedure is afforded to all patients who cannot be admitted voluntarily").

That is not true here. In a situation involving a potential emergency, as here, to require additional predeprivation safeguards would defeat the very purpose of the emergency statute. The Supreme Court made this point in <u>Hodel</u>: "The Court has often acknowledged, however, that summary administrative action may be

justified in emergency situations." 452 U.S. at 299-300. In such circumstances, summary procedures are justified because "swift action is necessary to protect the public health and safety." Id. at 301. As we recently noted in a case holding it would be impractical to require a predeprivation hearing: "[T]he variety of . . . circumstances within which the exception [to the general requirement of predeprivation process] has been recognized demonstrates that the exception is a flexible one," and "the Supreme Court's case-by-case approach to impracticality reflects the flexibility of due-process jurisprudence." Elena v. Municipality of San Juan, 677 F.3d 1, 6 (1st Cir. 2012).

Here, the very point of Puerto Rico's emergency procedures is to permit public officials to act promptly where there is an emergency. It would make no sense to require there first be a notice and hearing to determine whether the state may even invoke the emergency power. If a predeprivation hearing had to be held in these circumstances, "an official charged with discretion would be in the anomalous position of almost being forced to hold a hearing to determine whether or not an emergency exists, so as to then determine whether a predeprivation hearing is constitutionally required. This cannot be the proper result." Catanzaro v. Weiden, 188 F.3d 56, 63 (2d Cir. 1999); see also Harris v. City of Akron, 20 F.3d 1396, 1404 (6th Cir. 1994) (explaining that under Zinermon, the hospital admission "could have

been accomplished under <u>either</u> the voluntary or the involuntary admission procedure," but that under an emergency statute, "[i]f an emergency existed, the only available course of action for removing the threat to public health and safety was to" use emergency procedures "forthwith," and noting that "[a]n erroneous determination that no emergency existed would have resulted in the very threat to the public that the [summary procedure] was intended to prevent"). For these reasons, <u>Zinermon</u> does not control here.

The Supreme Court's jurisprudence regarding emergency procedures recognizes that even though those procedures may sometimes be invoked in error, such procedures nevertheless satisfy due process:

> The possibility of administrative error inheres in any regulatory program; statutory programs authorizing emergency administrative action prior to a hearing are no exception. . . . "Discretion of any official action may be abused. Yet it is not a requirement of due process that there be judicial inquiry before discretion can be exercised. It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination."

<u>Hodel</u>, 452 U.S. at 302-03 (quoting <u>Ewing</u> v. <u>Mytinger & Casselberry, Inc.</u>, 339 U.S. 594, 599 (1950)).[19]

_____

[19] The <u>Hodel</u> Court noted that "[a] different case might be presented if a pattern of abuse and arbitrary action were discernable from review of an agency's administration of a summary procedure," but a showing there that three summary orders had been overturned was "far from sufficient" to demonstrate such a pattern. <u>Hodel</u> v. <u>Va. Surface Mining & Reclamation Ass'n</u>, 452 U.S. 264, 302

-47-

4.    *Herwins*

Our conclusion that <u>Parratt</u>-<u>Hudson</u>, not <u>Zinermon</u>, governs this case is reinforced by <u>Herwins</u>, 163 F.3d 15, a case which SGCP agrees was correctly decided.  <u>Herwins</u> addressed the exercise of emergency powers by government officials.  There, a summary order requiring that a building be vacated was issued on the basis of a regulation allowing summary action where a building is "unfit for human habitation and must be vacated forthwith."  163 F.3d at 17 (internal quotation marks omitted).  <u>Herwins</u>, the building owner, brought a federal suit, alleging a procedural due process violation on the basis that closure of the building required prior notice and a hearing.  <u>Id.</u> at 16-17.  He introduced evidence that the inspector had falsely or recklessly reported violations of the building code and so exercise of the summary power was not justified.  <u>Id.</u> at 17.

Relying on <u>Parratt</u>-<u>Hudson</u>, we rejected Herwins's federal procedural due process claim.  As in this case, but for the official's mistake in declaring an emergency, the plaintiff there would have been provided a fuller hearing; nonetheless, we held that the plaintiff was not entitled to such a hearing before the declaration of an emergency.  <u>Id.</u> at 19.  And, as here, there were

n.46 (1981).  SGCP does not argue that this is a case of a pattern of abuse, and the facts do not support such an argument.

adequate means of post-deprivation redress.  Id. at 19-20.  We

explained that but for the Parratt-Hudson limitation:

>federal suits might be brought for countless
>local mistakes by officials in administering
>the endless array of state laws and local
>ordinances.  Often these errors have a
>procedural dimension -- e.g., a tax lien
>imposed after a misaddressed notice of taxes
>due -- and inflict temporary harm or
>inconvenience.  Assuming that the state
>remedies are themselves adequate, it has
>seemed sufficient to leave such random and
>individual errors to be corrected by state
>courts and agencies.

Id. at 19.

We rejected Herwins's attempt to rely on Zinermon,

explaining that:

>[w]hile state law led [the building inspector]
>to invoke summary closure, his "authorized"
>use of the summary power would not violate the
>Constitution, and [his] improper use is
>exactly the kind of "random and unauthorized"
>conduct that the local government had no duty
>(and indeed no practical way) to forestall
>through a predeprivation hearing -- a
>procedure itself inconsistent with true
>emergency conditions.

Id.

The same is true here.  We also noted that "Massachusetts

does provide for an opportunity to object before a building is shut

down except in emergencies."  Id.  Again, the same is true here.

We noted that in Zinermon, the "[c]onfinement of patients

not competent to consent was easily foreseeable and pre-deprivation

screening could feasibly be provided in non-emergency cases."  Id.

By contrast, neither condition obtained in <u>Herwins</u>; the same is true in this case. We concluded that "[w]here an official errs in declaring an emergency, the only feasible procedure is a post-deprivation remedy." <u>Id.</u>

SGCP's only attempt to distinguish <u>Herwins</u> is the argument that the Puerto Rico statutory emergency scheme at issue here confers more discretion than the statute at issue in <u>Herwins</u>. We doubt that is so, and we have already rejected the argument that § 2167 confers such uncircumscribed discretion so as to fall within <u>Zinermon</u>.

In sum, none of the grounds SGCP offers for distinguishing <u>Parratt</u>-<u>Hudson</u> has merit. The erroneous judgment by ARPE was exactly the type of "random and unauthorized conduct" encompassed by <u>Parratt</u>-<u>Hudson</u>. The Puerto Rico Supreme Court stated that ARPE simply "made a mistake" in invoking the emergency provisions. That court did find that the ARPE's judgment was wrong, but that does not remove the case from <u>Parratt</u>-<u>Hudson</u>; it instead establishes that this case fits firmly within <u>Parratt</u>-<u>Hudson</u>. That is the very kind of unanticipated mistake that is due to individual error, not induced by the statute.

There is no viable argument here that there were not adequate postdeprivation processes or remedies, which were utilized, to address predeprivation mistakes. In fact, SGCP did receive prompt postdeprivation process, when the Supreme Court of

-50-

Puerto Rico in related actions both confirmed its title and said ARPE had been mistaken in concluding there was an emergency warranting the stay. The case moved very rapidly throughout the relevant time period, leading to a stay of the permit suspension by the Puerto Rico Supreme Court after sixty-three days.

We clarify that we do not hold that whenever an official's conduct violates state law the Parratt-Hudson doctrine necessarily applies. Under Zinermon, there may be certain circumstances warranting the conclusion that such violations do not fall within the Paratt-Hudson doctrine. See Zinermon, 494 U.S. at 138 n.20 ("Contrary to the dissent's view of Parratt and Hudson, those cases do not stand for the proposition that in every case where a deprivation is caused by an 'unauthorized . . . departure from established practices,' state officials can escape § 1983 liability simply because the State provides tort remedies." (omission in original) (citation omitted)). To the extent that dicta in our precedent suggests otherwise,[20] that dicta is overruled.

---

[20] See PFZ Props., Inc. v. Rodriquez, 928 F.2d 28, 31 (1st Cir. 1991) (noting that "[w]hen a deprivation of property results from conduct of state officials violative of state law, the Supreme Court has held that failure to provide pre-deprivation process does not violate the Due Process Clause"); see also SFW Arecibo, Ltd. v. Rodríquez, 415 F.3d 135, 139-40 (1st Cir. 2005) (quoting PFZ Properties on this issue).

III.

Our reasoning as to the failure of the procedural due process claim extends beyond the members of ARPE to the defendant Governor and Secretary of Justice. These claims necessarily fail on the same reasoning the claims against the other defendant fail. The claims also independently fail for other reasons.

A.        The Secretary of Justice

As to the Secretary of Justice, SGCP failed to provide any argument before the district court or on appeal as to why his actions amounted to a procedural due process violation, so this claim is waived. Moreover, the opinion issued by the Secretary and relied on by SGCP belies any assertion that he ordered ARPE to violate SGCP's right to due process. The opinion made clear that it did not "dictate the precise method through which the different governmental entities concerned should proceed with their reevaluation and with any possible stay of the construction still ongoing," and stressed that the agencies should act pursuant to applicable laws and "safeguard[] any procedural and substantive law or rights the affected parties may have," including ensuring that all proceedings comported with "due process of law." As a result, and because the opinion is the sole basis for the due process claim against the Secretary, the due process claim against the Secretary necessarily fails.

B.        <u>The Governor</u>

SGCP's claim against the Governor rests upon the complaint's allegation that "the Governor publicly ordered all administrative agencies to suspend all permits for the Paseo Caribe Project and to freeze all permits for the Paseo Caribe Project and to freeze all construction for an initial period of sixty (60) days."  SGCP briefly argues, for the first time on appeal, that this allegation suffices to state a procedural due process claim and is viable even if the actions of the other defendants are "random and unauthorized," because the Governor is exempted from Puerto Rico's administrative procedure act.  <u>See</u> P.R. Laws Ann. tit. 3, § 2102(a)(3) (excluding from the definition of "agency" the "Office of the Governor and all its attached offices excepting those where the application of the provisions of this chapter have been literally expressed").  This argument fails.

At the outset, the complaint itself demonstrates that the Governor's actions fall within the scope of the <u>Parratt</u>-<u>Hudson</u> doctrine.  SGCP's complaint, in one of the only sentences discussing the actions of the Governor,[21] also pleads that "the

_____

[21]  It is also doubtful whether the complaint pleads sufficient facts as to the Governor's involvement to establish such a connection.  The complaint simply asserts that the Governor ordered all agencies to suspend all permits.  The Governor's alleged order is not quoted from or cited to in the complaint, and no such order, if it even existed, is mentioned in the Secretary of Justice's opinion, ARPE's orders, or any of the Puerto Rico judicial opinions in this case.  Even that statement in the complaint does not assert that the permits were ordered to be suspended without regard to due

-53-

Governor does not have the legal authority to suspend construction permits by decree."   This allegation is held against SGCP in assessing whether the <u>Parratt</u>-<u>Hudson</u> doctrine applies to the Governor.   <u>See</u> 5 Wright & Miller, <u>Federal Practice and Procedure</u> § 1226, at 302-03, 304 (3d ed. 2004) ("The pleader must be careful not to allege facts that constitute a defense to his claim for relief . . . .   A complaint containing a built-in defense usually is vulnerable under Rule 12(b)(6) to a motion to dismiss for failure to state a claim upon which relief can be granted.").   The complaint alone thus supports application of the <u>Parratt</u>-<u>Hudson</u> doctrine to the claim against the Governor.

---

process.   If the Governor did in fact issue such a "public[] order[]," it should have been straightforward for SGCP to provide more detail, quotations from the order, or a copy of it attached to the complaint.

Moreover, the undisputed facts lay out a clear chain of events that led to the permit suspension, with no involvement of the Governor mentioned.   ARPE acted in response to a Planning Board Resolution directing it to take "the preventative measures it deems necessary to implement the recommendations of the Secretary of Justice," "including the holding of an administrative hearing, with the guarantees of due process of law."   The Planning Board's Resolution, in turn, was based on the Secretary of Justice's opinion, which likewise stressed that the agencies should act pursuant to applicable laws and "safeguard[] any procedural and substantive law or rights the affected parties may have," including ensuring that all proceedings comported with "due process of law."

Given this background, and the dearth of facts pled as to the contents of the Governor's order, there is a fair question about whether the claim against the Governor meets <u>Iqbal</u>'s "facial plausibility" requirement, which requires the complaint to "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft</u> v. <u>Iqbal</u>, 129 S. Ct. 1937, 1949 (2009).   Even if it did, it fails for the reasons stated in the text.

SGCP has also failed to develop any argument as to why its claim against the Governor is not barred by the <u>Parratt</u>-<u>Hudson</u> doctrine.  Indeed, in its opposition to the motion to dismiss, SGCP argued that "the Governor lacks any valid legal authority to suspend construction permits by decree."  SGCP did not raise the argument that the Governor should be treated differently until its objection to the magistrate judge's report and recommendation, and even then did not raise the same argument it makes on appeal.  Instead it asserted in two sentences without citation to any authority that the non-ARPE defendants should be treated differently because "the UAPA does not apply in this case to officials who are not engaged in adjudication."  SGCP's argument on this point before the panel also consisted of two sentences, and even its argument before the en banc court was brief, consisting of two paragraphs which cited as authority only the definition in § 2102 and <u>Chmielinski</u>.  Basic issues necessary to assess SGCP's due process claim against the Governor, such as the Governor's authority to direct administrative agencies under Puerto Rico law, have not been addressed at all.  SGCP's claim against the Governor is accordingly waived.  <u>See</u> <u>P.R. Tel. Co.</u> v. <u>T-Mobile P.R. LLC</u>, 678 F.3d 49, 58 n.5 (1st Cir. 2012).

Apart from these independent reasons why SGCP's argument fails, it also fails on its own terms.  The Governor's actions fall squarely within the <u>Parratt</u>-<u>Hudson</u> doctrine.  The complaint's claim

of SGCP's injury was the suspension of its permits, which was directly ordered by ARPE, and not by the Governor, who lacked the power to do so. The statute authorizing the suspension of permits invoked in this case delegated that power to ARPE, not the Governor. See P.R. Laws Ann. tit. 23, § 71x (2008) ("The Administration[22] may issue orders to do or not to do, and to cease and desist so that the necessary preventative or control measures be taken to achieve the purposes of this chapter . . . ." (emphasis added)). Likewise, the Puerto Rico Supreme Court has stated that "[t]he order to stay or order to cease and desist is one of the remedies which may be delegated to the administrative agencies," and that "[u]pon reviewing the organic acts of several administrative agencies of the Commonwealth of Puerto Rico we expressly found such faculty delegated. For example, this occurs with . . . the Regulations and Permits Administrations Act, 23 L.P.R.A. sec. 71x." Consejo Para la Protección del Patrimonio Arqueológico Terrestre de P.R. v. Gobierno Municipal de Barceloneta, 168 P.R. Dec. 215, 225 (2006) (emphasis added) (quoted in San Gerónimo Caribe Project, Inc., 2008 WL 1744564 (certified translation provided by the parties)).

Further, ARPE was overseen not by the Governor, but by the Planning Board, another agency. See P.R. Laws Ann. tit. 23,

---

[22] The statute defines "Administration" as "The Regulations and Permits Administration," which goes by the acronym ARPE. P.R. Laws Ann. tit. 23, § 71b(a) (2008).

§ 71a (2008) ("The Regulations and Permits Administration is hereby created, attached to the Puerto Rico Planning Board."). The Governor does not appoint the ARPE administrator. Id. § 71c (providing that ARPE "shall be under the direction of a Regulations and Permits Administrator," who is "appointed by a majority of the members of the Planning Board, with the approval of the Governor"). The ARPE administrator does not report to the Governor, but instead "answer[s] directly to the [planning] board in the performance of his/her functions and shall hold office at its volition." Id. While the Planning Board's seven members were appointed by the Governor with the advice and consent of the Senate, id. § 62d, they were appointed "for the duration of the quadrennium in which they were appointed,"[23] and could "only be dismissed for just cause," id. § 62e. The Act establishing the Planning Board contains no general provision granting the Governor authority to direct its operations -- its decisions are made through majority vote of the Planning Board members. Id. § 62i.

SGCP develops no argument that the Governor has authority to direct the operations of either the Planning Board or ARPE.

---

[23] The statute itself does not make clear whether these four-year terms are staggered. Puerto Rico amended the Planning Board statute in 2001 to provide for an increase in the number of board members from three to seven, and to increase the number of "alternate members" who are to substitute for members in the case of vacancies from one to three, but the statute does not itself state whether the terms of the members were staggered. See P.R. Laws Ann. tit. 23, § 62d & note (2008).

SGCP also does not claim that if the Governor had such authority, it could be used to direct ARPE to violate Puerto Rico law in suspending SGCP's permits. It is clear that the Governor lacks authority under Puerto Rico law to alter or exceed the authority conferred by duly enacted statutes. See, e.g., Díaz de Llovet v. Office of the Governor, 12 P.R. Offic. Trans. 941 (1982) (holding that legislation governing classification of employees in the Governor's Office did not confer certain authority on the Governor and "[l]acking this power, the Governor could not change the Legislative will through a set of regulations").

Indeed, it would be illogical for a governor's order to a subordinate agency to violate statutory constraints on the agency to be "authorized" within the meaning of Parratt-Hudson. If the governor did issue an order to ARPE, his actions were random and unauthorized.

SGCP also makes no argument that the Parratt-Hudson doctrine should apply differently simply because the Governor is a high-ranking official. If that is the intended argument, we reject it. Nothing in Parratt, Hudson, Zinermon, or this circuit's case law states that there is an exception for high-ranking state officials to the usual method of determining whether an action is random or unauthorized. In this, we join the views of two other circuits on the matter. See Johnson v. La. Dep't of Agric., 18 F.3d 318, 322 (5th Cir. 1994) ("Simply because Odom is a high state

official does not mean that his actions are automatically considered established state procedure that would take the case outside of the Parratt/Hudson doctrine."); Easter House, 910 F.2d at 1400 ("The question of whether a state official ranks 'high' or 'low' in the state hierarchy, while possibly relevant as indica of the discretion which that official exercises, cannot by itself be dispositive of this determination.").

To the extent the Second Circuit has adopted such a distinction, we decline to follow it. See Rivera-Powell v. N.Y. City Bd. of Elections, 470 F.3d 458, 465 (2d Cir. 2006) ("This court has since relied on Zinermon to hold that the acts of high-ranking officials who are 'ultimate decision-maker[s]' and have 'final authority over significant matters,' even if those acts are contrary to law, should not be considered 'random and unauthorized' conduct for purposes of a procedural due process analysis." (alteration in original) (quoting Velez v. Levy, 401 F.3d 75, 91-92 & nn.14 & 15 (2d Cir. 2005))). Nor is it clear that the Second Circuit would apply its doctrine here because the Governor, both as a matter of fact and of law, was not the ultimate decision-maker nor did he have the final authority to suspend permits. Simply because an official is high-ranking does not mean that the official's actions are automatically placed outside the scope of Parratt-Hudson, so long as those officials are bound by statutory limits on their authority under state law. As a result,

the Parratt-Hudson doctrine applies to bar SGCP's claim against the Governor, and the procedural due process claim against the Governor was properly dismissed.

## IV.

The dismissal of the plaintiff's complaint is affirmed. Costs are awarded to defendants-appellees.

**- Concurring Opinion Follows -**

**LIPEZ, Circuit Judge, concurring.** This case highlights two important facets of the Parratt-Hudson doctrine not yet addressed by the Supreme Court: application of the "random and unauthorized" jurisprudence to a state's highest ranking official and the availability of qualified immunity to state actors whose disregard of state law provides the basis for a procedural due process claim. Although I agree with my colleagues' conclusion that the San Gerónimo Caribe Project, Inc. ("SGCP") has not alleged a viable due process claim against any of the defendants, I do not share their willingness to apply the "random and unauthorized" standard to the alleged conduct of the Governor. The outrageous behavior of the Commonwealth's chief executive, as alleged, should not be analyzed in the same way as the unauthorized and unpredictable acts of the prison employees whose conduct was at issue in Parratt and Hudson. See Parratt v. Taylor, 451 U.S. 527 (1981); Hudson v. Palmer, 468 U.S. 517 (1984). I also write separately to express my view that the Supreme Court's Parratt-Hudson jurisprudence, as elaborated in Zinermon v. Burch, 494 U.S. 113 (1990), cannot sensibly be applied in the qualified immunity context. My hope is that the Court will soon provide much-needed clarification, ending the decades of uncertainty surrounding the Parratt-Hudson doctrine.

I accept and join the majority's analysis of the claims against the ARPE and the Secretary of Justice. With respect to the Governor, however, it is unnecessary in this case to undertake the usual Parratt-Hudson inquiry into the defendant's authority and discretion and, as I shall explain, I believe it is inappropriate to do so. In my view, the claim against the Governor fails because the allegations do not plausibly allege a causal link between the Governor's order and the harm to SGCP. The complaint baldly asserts that the Governor, through his directive to agency officials to halt construction,[24] "willfully caused subsequent actions by those officials." Compl. ¶ 30. The complaint, however, does not describe any relationship between the Governor's pronouncement and subsequent events. Both the Planning Board and the ARPE administrator cited the previously issued Secretary of Justice's opinion, not the Governor's order, as the impetus for initiating the proceedings that led to the suspension of SGCP's project.[25] Thus, in effect, the complaint depicts the Governor's

---

[24] The complaint does not quote the Governor directly, but alleges that "the Governor publicly ordered the various agencies that had issued permits for the Project to withdraw or suspend those permits and thereby force a halt to construction." Compl., at 3. See also id. ¶ 29 (alleging that the Governor "publicly ordered all administrative agencies to suspend all permits for the Paseo Caribe Project and to freeze all construction for an initial period of sixty (60) days").

[25] The complaint alleges that "all subsequent actions by governmental agencies suspending permits for the Paseo Caribe

order as merely an outrageous political statement without any impact on appellant's property rights.

The Governor's alleged involvement in the controversy is troubling, however. Some five years after construction on the project had begun, with one part nearing completion and more than $200 million already invested by SGCP, the Governor issued the order to suspend all permits and freeze construction for sixty days. There was no emergency involving public health, safety or welfare. Instead, there was a vocal group of protesters with a significant political constituency. Yet, according to the complaint, the Governor issued an edict that did not contemplate any opportunity for San Gerónimo to defend its permits at a hearing before they were suspended.

The Governor's unique role as the chief executive of the Commonwealth raises the question of whether a defendant's high status in the state hierarchy should be a factor in the Parratt-Hudson inquiry. Under the majority's reasoning, even if the Governor's directive had instigated the subsequent events, SGCP would be without a constitutional remedy for the harm caused. Yet, the Supreme Court surely did not have in mind the conduct of a state's chief executive, acting in his official capacity, when it rejected the claims in Parratt and Hudson to avoid "turning every

Project have been undertaken either at the Secretary's direction or with his knowledge and assistance or that of his subordinates at the Department of Justice." Compl. ¶ 28.

-63-

alleged injury which may have been inflicted by a state official acting under 'color of law' into a violation of the Fourteenth Amendment cognizable under § 1983."  Parratt, 451 U.S. at 544.

The suspension of permits by gubernatorial fiat does not resemble the low-level misconduct at issue in Parratt and Hudson, and allowing a procedural due process claim based on the Governor's involvement in the permit suspension would not make a federal case out of an ordinary tort.  To the contrary, such a claim would be consistent with longstanding precedent holding that § 1983 is available as a remedy for injuries inflicted by the abuse of state power, as well as by state law itself.  See Monroe v. Pape, 365 U.S. 167, 175-76 (1961) (explaining that § 1983 was created, in part, as a remedy "against those who representing a State in some capacity were unable or unwilling to enforce a state law"); id. at 183 ("It is no answer that the State has a law which if enforced would give relief."); see also Zinermon, 494 U.S. at 124 (noting that Monroe "rejected the view that § 1983 applies only to violations of constitutional rights that are authorized by state law, and does not reach abuses of state authority that are forbidden by the State's statutes or Constitution or are torts under the State's common law"); id. at 125 ("[I]n many cases there is 'no quarrel with the state laws on the books'; instead, the problem is the way those laws are or are not implemented by state officials." (quoting Monroe, 365 U.S. at 176) (citation omitted)).

Of course, tension among the principles of Monroe, Parratt-Hudson, and Zinermon has long been noted by courts and scholars, traceable to an apparent disagreement within the Court about when the unlawful acts of a state actor should be attributable to the state and thus provide the basis for a finding of a constitutional violation. See, e.g., Bogart v. Chapell, 396 F.3d 548, 564-65 (4th Cir. 2005) (Williams, J., dissenting); Easter House v. Felder, 910 F.2d 1387, 1408-09 (7th Cir. 1990) (Easterbrook, J., concurring); Jose R. Juarez, Jr., The Supreme Court as the Cheshire Cat: Escaping the Section 1983 Wonderland, 25 St. Mary's L.J. 1, 5-7 (1993) ("Cheshire Cat"); Larry Alexander, Constitutional Torts, the Supreme Court, and the Law of Noncontradiction: An Essay on Zinermon v. Burch, 87 Nw. U. L. Rev. 576, 580-83 (1993) ("Law of Noncontradiction"). Indeed, Judge Easterbrook has observed that the Parratt-Hudson-Zinermon line of cases "resembl[es] the path of a drunken sailor." Easter House, 910 F.2d at 1409 (Easterbrook, J., concurring); see also id. at 1408 (noting that Parratt-Hudson and Zinermon "cannot coexist, except perhaps by drawing a distinction between liberty and property, or between important and modest deprivations, neither of which the majority in Zinermon adopted").

Scholars have identified "two competing visions of § 1983 liability," labeled the "Governmental" model and the "Legalist" model. Bogart, 396 F.3d at 564 (Williams, J., dissenting). Under

the former, reflected in the Court's decision in Monroe, liability may be imposed under § 1983 "for all constitutional violations committed by governmental actors in the scope of their employment -- even if the actor violates state law when committing the violation."  Id.  Under the latter, reflected in Parratt and Hudson, section 1983 "imposes liability only if state lawmakers endorse a constitutional violation."  Id.[26]

Allusions to both models appear in the majority opinion in Zinermon, and that inconsistency has left lower courts debating whether the Supreme Court intended a narrow (more Legalist) or broad (more Governmental) reading of the case -- and, in turn, a

_____

[26]    Crediting Professors Larry Alexander and Paul Horton for developing the concept, Professor Juarez describes the two models as follows:

> The Legalist Model asks whether state laws are constitutionally adequate.  If there is an adequate state law, then the plaintiff cannot bring a Section 1983 claim, and must instead rely on state-law claims heard, in most cases, in state court.  . . . The Governmental Model imposes duties on more than state and local lawmakers; it imposes duties on all government officials and agents.  Under the Governmental model, it doesn't matter whether the state and local lawmakers have forbidden the infringement of constitutional rights, or have attempted to provide a remedy for such infringements.  What matters is whether any state official has infringed the plaintiff's constitutionally protected interests.  . . . [U]nder the Governmental Model, plaintiffs may . . . sue under Section 1983 in either state or federal court, even when the state's lawmakers have sought to prevent the violation of constitutional rights.

Cheshire Cat, 25 St. Mary's L.J. at 8, 10 (footnotes omitted).

narrow (more Governmental) or broad (more Legalist) reading of the Parratt-Hudson doctrine.   See, e.g., Bogart, 396 F.3d at 565 (Williams, J., dissenting); Cheshire Cat, 25 St. Mary's L.J. at 27-37 (describing confusion in the lower courts); Law of Noncontradiction, 87 Nw. U. L. Rev. at 596 ("It is not an overstatement to describe the Supreme Court's constitutional torts jurisprudence as a welter of confusion, leaving litigants and lower courts completely at sea.").[27]   Professor Juarez has proposed simplifying the procedural due process inquiry by returning it to pre-Parratt standards, i.e., permitting "[s]ection 1983 procedural due process claims challenging deprivations without predeprivation hearings except when there is a need for quick action or when it is impractical to provide the predeprivation hearing."  Cheshire Cat, 25 St. Mary's L.J. at 65.  He maintains that, with the quick-action and impracticality limitations on § 1983 claims, "there should be no danger of transforming Section 1983 into the 'font of tort law' feared by so many courts."  Id. at 65-66.[28]

---

[27] Some of the confusion may be attributable to the fact that the issue in Parratt and Hudson was not the denial of a hearing. See Law of Noncontradiction, 87 Nw. U. L. Rev. at 589 ("The bone of contention in both cases was the deprivation, not the process that led up to it.").

[28] The Supreme Court first warned against turning the Fourteenth Amendment into "a font of tort law" in Paul v. Davis, 424 U.S. 693, 701 (1976), and the phrase has been used frequently since then, including in Parratt. See 451 U.S. at 544 (quoting Paul). See also, e.g., Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748, 768 (2005) (noting the Court's "continuing reluctance to treat the Fourteenth Amendment as '"a font of tort law,"'" and

Even under a broad construction of the principle espoused in <u>Parratt</u> and <u>Hudson</u>, however, actions undertaken by a governor in his or her official capacity should be attributed to the State. The Supreme Court in <u>Hudson</u> described the inquiry as "whether the <u>state</u> is in a position to provide for predeprivation process." <u>Hudson</u>, 468 U.S. at 534 (emphasis added).  It is one thing to say that an errant prison guard is an actor whose actions, in certain instances, cannot be the basis for a procedural due process violation because they are not the acts of "the State."  It is another thing to insulate a State from responsibility for the Governor's conduct.[29]  Moreover, low-level employees routinely interact with private individuals on small matters, and it is impossible to implement procedures to prevent some "tort-like" harms from occurring.  The higher you go up in the hierarchy, the more formal the interactions with the public will be, and it

---

quoting <u>Parratt</u> and <u>Paul</u>); <u>College Sav. Bank</u> v. <u>Fla. Prepaid Postsecondary Educ. Expense Bd.</u>, 527 U.S. 666, 674 (1999) (noting "our frequent admonition that the Due Process Clause is not merely a 'font of tort law,'" and quoting <u>Paul</u>).  Our precedent reflects the same sentiment.  <u>See</u> <u>Herwins</u> v. <u>City of Revere</u>, 163 F.3d 15, 19 (1st Cir. 1998) (noting that, but for the limitation on procedural due process claims where "the state provides an adequate means of redress," "federal suits might be brought for countless local mistakes by officials in administering the endless array of state laws and local ordinances").

[29] The Eleventh Amendment, of course, protects states from damages liability.  I refer to the State's "responsibility" only in the sense that identifying a procedural due process violation under the <u>Parratt-Hudson</u> doctrine requires an examination of whether the State could have, and thus should have, prevented the denial of predeprivation process effected by state employees.

becomes less plausible to say that the actor's conduct was distinct from the State's for the purpose of the due process inquiry.  Where the per se "state actor" line in the context of Parratt and Hudson should be drawn is a worthy subject of discussion.  There can be no debate, however, about where the Governor stands in relation to that line.[30]

As the majority points out, at least two circuits have rejected a defendant's status as a determinative factor.  See Johnson v. La. Dep't of Agric., 18 F.3d 318, 322 (5th Cir. 1994); Easter House, 910 F.2d at 1399-1400 (en banc).  The Second Circuit, however, has emphasized the significance of status: "Since the 'state acts through its high-level officials,' the decisions of these officials more closely resemble established state procedures than the haphazard acts of individual state actors . . . ." Velez v. Levy, 401 F.3d 75, 92 (2d Cir. 2005); see also Rivera-Powell v. N.Y. City Bd. of Elections, 470 F.3d 458, 465 (2d Cir. 2006).  The court in Velez noted that the defendant, the Chancellor of the City

---

[30] I am not suggesting that only the conduct of policymaking officials should be attributable to the State for purposes of a procedural due process claim.  At a minimum, under Zinermon, the State also acts through "any person to whom is delegated the responsibility of giving predeprivation process."  Easter House, 910 F.2d at 1411 (Cudahy, J., dissenting); see also Zinermon, 494 U.S. at 138 (explaining that, where a state "delegate[s] to [defendants] the power and authority to effect the very deprivation complained of . . . , and also delegate[s] to them the concomitant duty to initiate the procedural safeguards set up by state law to guard against unlawful [deprivations]," conduct abusing that authority is not "'unauthorized' in the sense the term is used in Parratt and Hudson").

School District of New York, had "the duty . . . to follow the governing New York statutes and regulations," and it held that "'any abuse of that authority that rose to the level of a due process violation cannot be considered "random and unauthorized."'" 401 F.3d at 92 (quoting <u>DiBlasio</u> v. <u>Novello</u>, 344 F.3d 292, 303 (2d Cir. 2003)).

The circuit conflict is unsurprising in light of the inconsistency and confusion in the precedent described above. <u>See</u> <u>Cheshire Cat</u>, 25 St. Mary's L.J. at 24-25 ("If we are confused today, it is because the Supreme Court itself seems to be confused about what it is doing in these Section 1983 cases." (footnote omitted)). With respect to the Governor, however, I think it is plainly unacceptable to say that his conduct, albeit improper under Commonwealth law, was "unauthorized" in the <u>Parratt-Hudson</u> sense, regardless of whether one prefers the Legalist or Governmental model. The Governor is the chief of state and, as such, his official acts are always those of "the State." At a minimum, <u>Monroe</u> must mean that a viable section 1983 procedural due process claim will arise if the Governor sets in motion the denial of procedural protections to an individual entitled to predeprivation process. <u>See</u> <u>Zinermon</u>, 494 U.S. at 138 ("The deprivation here is 'unauthorized' only in the sense that it was not an act sanctioned by state law, but, instead, was a 'depriv[ation] of constitutional

rights . . . by an official's abuse of his position.'" (quoting Monroe, 365 U.S. at 172) (alteration in original)).

More than two decades ago in Easter House, Judge Easterbrook observed that the Supreme Court's inconsistent Parratt-Hudson jurisprudence had left "judges of the inferior federal courts in a difficult position, because any effort to reconcile and apply the cases will be met with a convincing demonstration . . . that there is a fly in the ointment."  910 F.2d at 1409.  His concurrence in Easter House was flanked by just such a debate between majority and dissenting opinions.  The debate is ongoing, and there is plainly a need for clarification and guidance from the Supreme Court.

## II.

Qualified immunity protects government officials from personal liability for damages arising from violations of constitutional rights that were not "clearly established" when the challenged conduct occurred.  Feliciano-Hernández v. Pereira-Castillo, 663 F.3d 527, 532 (1st Cir. 2011).  The doctrine "'balances two important interests -- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" Glik v. Cunniffe, 655 F.3d 78, 81 (1st Cir. 2011) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)).  To decide whether a defendant

is entitled to qualified immunity, we must determine, inter alia, the clarity of the law establishing the constitutional right at issue and "whether, given the facts of the particular case, a reasonable defendant would have understood that his conduct violated the plaintiff['s] constitutional rights." Id. (alteration in original) (internal quotation mark omitted). The key to qualified immunity is "the objective legal reasonableness of an official's acts." Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982)).

As the discussion in Section I demonstrates, a court would be hard-pressed to say that the law surrounding the Parratt-Hudson doctrine is clearly established. Indeed, the original panel in this case concluded that our own case law contains statements that reasonably could be read to adopt an erroneous interpretation of Parratt and Hudson. We thus held that, even though the defendants had committed a procedural due process violation, they were entitled to qualified immunity. See San Gerónimo Caribe Project, Inc. v. Acevedo-Vilá, 650 F.3d 826, 838-39 (1st Cir.), vacated and opinion withdrawn, 665 F.3d 350 (1st Cir. 2011) (en banc).

I now realize, however, that we reached that conclusion by focusing on the clarity of the wrong law. The qualified immunity inquiry in the context of a procedural due process claim cannot turn on whether it was clear that the circumstances fit the mold of Zinermon rather than Parratt-Hudson. The constitutional

-72-

violation at issue is the denial of predeprivation process, and to assess the reasonableness of the defendant's conduct, we logically must focus on the clarity of the law concerning the plaintiff's entitlement to a hearing. It has been clearly established for more than a half-century that "a deprivation of life, liberty, or property [ordinarily must] 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985) (quoting Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950)); see also Mathews v. Eldridge, 424 U.S. 319, 334-35 (1976) (describing the balancing of interests necessary to determine "due process").

Hence, if we had determined that any of the defendants in this case had violated SGCP's due process rights by failing to hold a meaningful hearing before suspending their permits, the only basis for qualified immunity should be the defendant's reasonable uncertainty about whether the circumstances presented an "extraordinary situation[]" in which a valid governmental interest justified postponing the hearing until after the challenged action. United States v. James Daniel Good Real Prop., 510 U.S. 43, 53 (1993). Uncertainty about the applicability of Parratt-Hudson is irrelevant to the qualified immunity analysis because the Parratt-Hudson has nothing to do with the rationale for protecting officials from damages liability: to eliminate the risk that, in areas where the law is not clearly established, officials will

refrain from independently acting in the public interest for fear of being sued. See Harlow, 457 U.S. at 814.

Indeed, as SGCP points out, the "peculiarity" of the Parratt-Hudson doctrine is that it does not focus on what a reasonable official should have known or done in light of clearly established law. Rather, the Parratt-Hudson-Zinermon question is whether the official's alleged misconduct is attributable to the State -- and thus remediable as a constitutional violation. When Zinermon is found to apply, and the plaintiff succeeds in showing that clearly established law entitled him to predeprivation process, the defendant state official should not be able to avoid personal liability by raising a qualified immunity defense based on Parratt-Hudson. Granting immunity based on the lack of clarity as to whether the State bears responsibility would turn the qualified immunity doctrine on its head. The official would in effect be seeking immunity based on a "reasonable" belief that his conduct was so wrong -- i.e., it was "random and unauthorized" -- that it could not provide the basis for a procedural due process claim. Such an immunity would provide an unacceptable "license to lawless conduct." See Harlow, 457 U.S. at 819.

It is disturbing enough that bad-acting officials escape liability for a constitutional injury when the Parratt-Hudson doctrine applies and the wrongful denial of predeprivation process

is not a due process violation.[31]  It would be a greater injustice,
and undermine the objective of the qualified immunity doctrine, for
a court to find a due process violation but provide no remedy to
the plaintiff because the defendant could have thought that the
Parratt-Hudson doctrine would let him (along with the State) off
the hook for his violation of clearly established due process law.

In sum, the qualified immunity doctrine in the procedural
due process context must be applied consistently with its purpose
to shield well-meaning and reasonable public officials from the
burden of damages while holding accountable those officials who
"exercise power irresponsibly," Glik, 655 F.3d at 81.  The Parratt-
Hudson doctrine itself denies a federal remedy to individuals
harmed by the random and unauthorized conduct of state actors; the
uncertainty surrounding the doctrine's scope should not be used to
further extend the immunity of rogue state officials.

---

[31] As we observed in Herwins,

> the law might have developed so as to hold the official
> liable under the Fourteenth Amendment for his own mistake
> even if the state had done all it could. . . . But the
> Supreme Court has ruled that in such cases there is no
> denial of procedural due process, even by the official,
> so long as the state provides an adequate means of
> redress.

163 F.3d at 19.  Oddly, this approach seems to give officials an
incentive to behave as outrageously as possible in certain
circumstances because the further the departure from "clearly
established law," the more likely Parratt-Hudson will apply.  Of
course, the risk of state remedies would remain.

## III.

The confusion surrounding the parameters of the Parratt-Hudson doctrine is not merely an academic puzzle. The Constitution demands that we attempt to insure "justice in the individual case." Laura Oren, Signing into Heaven: Zinermon v. Burch, Federal Rights, and State Remedies Thirty Years After Monroe v. Pape, 40 Emory L.J. 1, 70 (1991). At best, the Parratt-Hudson doctrine has been an unreliable way to advance that objective because of the mixed messages from the Supreme Court concerning its scope. The doctrine's rote application to high-ranking government officials is particularly troubling, and it creates a stark conflict with long established precedent holding that the State bears responsibility for the abuse of governmental authority by state officials. The conflict and confusion concerning the Parratt-Hudson doctrine should not, however, provide a basis for immunizing government officials who have acted in blatant disregard of the law from personal liability for their wrongdoing. Under standard qualified immunity principles, the only pertinent question when an unconstitutional denial of predeprivation process has occurred is whether the defendant should have known that the Constitution required such predeprivation process.

Additional guidance from the Supreme Court on these issues is both necessary and inevitable. Until such time as that Court speaks, lower courts attempting to provide "justice in the

individual case" should be wary of unnecessarily extending its procedural due process precedents beyond their narrowest boundaries.